Filed 7/11/16  Two Play Properties v. Bank of the West CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TWO PLAY PROPERTIES,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>BANK OF THE WEST, et al.,<br><br>    Defendants and Respondents.<br><br>---<br><br>ARON MARGOSIAN, et al.,<br><br>    Plaintiffs, Cross-Defendants and Appellants,<br><br>        v.<br><br>BANK OF THE WEST, et al.,<br><br>    Defendants, Cross-Complainants and Respondents. | F068520<br>(Consol. with Case No. F070814)<br><br>(Super. Ct. No. 238202)<br><br>**OPINION** |

APPEAL from a judgment and order of the Superior Court of Tulare County. Melinda M. Reed, Judge.

Foley Bezek Behle & Curtis, Peter J. Bezek, Roger N. Behle, Jr., Justin P. Karczag and Aaron L. Arndt for Plaintiffs, Cross-Defendants and Appellants Two Play Properties, Aron Margosian and Carrie Margosian.

Miller Barondess, Brian A. Procel and Mira Hashmall for Defendants, Cross-Complainants and Respondents Bank of the West, Kurt Covington and Erin Bushell.

-ooOoo-

"Neither a borrower nor a lender be; [¶] For loan oft loses both itself and friend." (Shakespeare, Hamlet, act I, scene 3.)  Aron Margosian (Aron), an experienced commercial farmer, and his longtime friend, Martin Zaninovich (Zaninovich), co-owned multiple commercial farming businesses.  In 2006, they formed a company, ZMC Fresh, Inc. (ZMC), to build a packing and cold storage facility in Dinuba.  The packing facility was part of a business concept, which Aron called a "farm-to-fork" enterprise, whereby Aron and Zaninovich's company, Two Play Properties, LLC (Two Play), would farm and harvest fruit, which would be packaged at the packing facility and then distributed by Zaninovich's produce company, Z&S Fresh, Inc. (Z&S).  Due to substantial cost overruns on the packing facility, Aron and Zaninovich diverted funds from Two Play and Z&S to ZMC.

Aron and Zaninovich's companies took out a number of loans from Bank of the West (Bank) to fund their enterprises.  In September 2008, Aron and his wife, Carrie Margosian (collectively the Margosians), personally guaranteed a loan the Bank issued to Two Play, which in turn guaranteed a loan the Bank issued to Z&S.  By the summer of 2009, both Z&S and Two Play had defaulted on their loans and collapsed financially.

The Margosians sued the Bank and its employee, Erin Bushell (collectively the Bank), for fraud and sought rescission of their personal guaranties, alleging that the Bank misled them about the financial risks of the Z&S loans and fraudulently induced them into signing their personal guaranties.

Three years into the case, after the trial court granted the Bank's motion for judgment on the pleadings on the ground that the Margosians did not have standing to recover damages that belonged to Two Play, Two Play was added as a plaintiff and asserted claims for fraud, rescission, and aiding and abetting a breach of fiduciary duty.

2.

The trial court sustained the Bank's demurrer to Two Play's claims without leave to amend, in part because its claims were time-barred and did not relate back to the Margosians' prior complaints.

Thereafter, the Margosians filed a motion for summary adjudication, in which they sought a determination that the Bank owed them a duty of disclosure under *Sumitomo Bank of California v. Iwasaki* (1968) 70 Cal.2d 81 (*Sumitomo*). The trial court denied the motion, finding there were triable issues of fact. After a nine-day bench trial, the trial court found that the Margosians failed to prove that the Bank fraudulently induced them to guarantee the Two Play loans. During a second phase of the trial, the trial court adjudicated the Bank's cross-complaint for breach of the Margosians' guaranties of Two Play's loans. The trial court awarded the Bank nearly $400,000 in damages and $1.2 million in attorney fees.

Both Two Play and the Margosians appeal – Two Play appeals the trial court's order sustaining the Bank's demurrer, while the Margosians appeal from the judgment.[1] In its appeal, Two Play contends that the trial court erred in sustaining the demurrer because its claims relate back to the filing date of the Margosians' original complaint. In their appeal, the Margosians present what they assert is a purely legal issue – whether the trial court erred in concluding that the Bank did not owe them a duty of disclosure under *Sumitomo*. Finding no reversible error in either case, we affirm the trial court's order sustaining the Bank's demurrer as to Two Play and the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1976, Aron started a family farm operation after he began acquiring large parcels of farm land, primarily in Exeter, California, which included property referred to as the Exeter family farm (the Exeter property). Since at least 1995, Aron had been in a

---

[1] Two Play's appeal is case number F068520, while the Margosians' appeal is case number F070814. We previously granted the parties' request to consolidate the two cases.

3.

joint business relationship with Zaninovich. The two worked together to sell produce grown by a California family-owned partnership that included Aron, his mother, and his uncle.

In January 1999, the Margosians and Zaninovich formed a general partnership, Two Play Farms, to farm and hold title to the Exeter property. Over the next 10 years, Aron, his family members, and Zaninovich formed additional partnerships and joint ventures for the purpose of purchasing and managing farmland and facilities to further their overall farming business goals, including entities known as Three Play Farms (which Aron and Zaninovich owned with Aron's cousin) and Four Play Farms.

Aron and Zaninovich agreed that in their partnership, Aron would manage the farming operation, while Zaninovich would be responsible for the day-to-day financial operation. Aron and Zaninovich, who by 2013 had known each other for 40 years and been business partners for 15 or 16 years, operated as equal partners. They agreed that the proceeds from the sale of Two Play Farms' produce would be split equally between them, and that Aron's half of the proceeds would be kept in a grower account at Zaninovich's produce distributing company, Z&S. Two Play Farms marketed its produce through Z&S. Aron also had a personal grower account in his individual name at Z&S, in which he placed funds earned through his individual farming unrelated to Two Play Farms. Three Play Farms and Four Play Farms also had grower accounts at Z&S.

In 2002, Aron and Zaninovich formed another company, Two Play Arizona Partnership, which later became Two Play Properties Arizona, LLC (Two Play Arizona). The company purchased a cold storage facility in Nogales, Arizona, which Z&S rented on favorable terms.

*The 2006 Loan*

In August 2006, Two Play Farms and Z&S each took out loans from the Bank: (1) Two Play Farms borrowed $1.3 million on a term loan to refinance an existing loan on the Exeter property (the 2006 Two Play loan); and (2) Z&S borrowed $5.5 million,

4.

which was comprised of a $4 million revolving loan and a $1.5 million term loan (the 2006 Z&S loan). Aron and Zaninovich used the Exeter and Two Play Arizona properties as collateral for both loans. The deeds of trust encumbered the entire Exeter property, including the Margosians' one-half share.

In November 2006, Aron and Zaninovich formed Two Play as a successor in interest to the Two Play Farms partnership. Aron and Zaninovich were both managing members of Two Play, but their division of responsibilities did not change.

*The Packing Facility*

In 2006, the Margosians, Zaninovich, and their business partners, James and Scott Critchley (the Critchleys), formed a new company, ZMC. In December 2006, the Bank issued a $500,000 line of credit and a $2 million term loan to ZMC (the ZMC loan). The term loan was to be used to finance the purchase and remodeling of a fruit and vegetable packing and cold storage facility in Dinuba, and to purchase related equipment, while the line of credit was to be used for working capital expenses associated with ZMC's operation. Aron signed the credit agreement for the ZMC loan on ZMC's behalf.

The Margosians, along with Zaninovich and Z&S, executed personal guaranties of the Bank's loan to ZMC. Aron understood that he could be held responsible if ZMC failed to repay the loan. The Margosians signed the personal guaranties without asking to review any of ZMC's financial documents. ZMC's attorney, Patrick Schoenburg, reviewed the personal guaranty before Aron signed it.

In 2007, the Critchleys pulled their investment from ZMC. Thereafter, the parties referred to ZMC as ZM. In November 2007, the Fresno-Madera Federal Land Bank Association (Land Bank) assumed $2.1 million of ZM's loan by paying that amount to the Bank. By mid-2008, ZM was indebted to the Land Bank on a $3.9 million term loan and to the Fresno-Madera Production Credit Association on a one-year $1 million operational revolving line of credit. Both loans were personally guaranteed by Z&S, Zaninovich and the Margosians.

5.

The packing facility started with a $4 million budget, but due to cost overruns, more than $11 million was put into the project. The money came from another investor, Ed Derderian, the Land Bank loans, and Aron; Z&S also provided money to the packing facility to finish the build-out. Aron and Zaninovich redirected funds from other sources, including their joint businesses and personal funds, to ZM. They were largely using money from Z&S to develop ZM.

In January 2007, Aron personally loaned Zaninovich $460,000, which he was to repay with interest by July 2007. There was no written agreement for the loan; Aron was comfortable writing the check without one due to his relationship with Zaninovich. Aron used his home as collateral for the money and maxed out his line of credit; he would have gotten more money had he been able to. Zaninovich never repaid the loan. The two had open discussions about the loan: Zaninovich told Aron "our moneys" were going straight back into the packing facility and that he had taken all of the money out of his house as equity; Aron responded that he had done the same.

Zaninovich and Aron began to funnel funds from Z&S and Two Play into the packing facility. In April 2007, attorney Ken Fitzgerald gave Aron a $270,000 check that Aron gave to Z&S. Aron and Zaninovich signed Z&S's March 2008 balance sheet, which showed Z&S with $2.7 million in debt on the line of credit and $6.5 million in liabilities. By April 2008, Ed Derderian had injected $900,000 into ZM to be a partner. At the beginning, this was to be an investment, but at some point it was converted to a loan. The Margosians left up to $1 million or more in their Z&S grower accounts.

*The May 2008 Bank Meeting*

On May 20, 2008, Erin Bushell (Bushell), the Bank's representative, met with Aron and Zaninovich to discuss Z&S's financial condition. Over $3 million of the 2006 Z&S loan was due in four months and Z&S was shifting its operating money to fund other related entities, which was a violation of the terms of the 2006 Z&S and Two Play credit agreements, both of which prohibited the transfer of assets except in the ordinary

6.

course of business.  Bushell intended to address how Two Play proposed to reimburse Z&S for capital expenditures made on Three Play's behalf, as well as additional real estate Two Play was thinking of pledging and who the investors would be.  The Margosians were heavily invested in loans they had made to Z&S, which were not being repaid.

The parties discussed: (1) that Z&S had lent its operating money to Two Play and Three Play, which was taking a toll on Z&S, and that those entities needed to repay their loans; (2) Aron's and Zaninovich's efforts to inject capital into Z&S; and (3) restructuring and refinancing the loan to deal with Z&S's financial issues.  According to Jeff Covey, Z&S's controller and financial consultant who attended the meeting, the parties talked about additional financing for Z&S and its affiliates, as they were building the ZM packing facility, and cross-collateralization by the various entities.  As a result of the meeting, the Bank extended the 2006 Z&S loan a month or two to give the Bank time to determine if it could issue a new or increased loan to Two Play so it could pay back Z&S.

On June 26, 2008, Aron loaned Z&S $150,000.  Aron borrowed the money from a crop line of credit at Wells Fargo Bank, which he then gave to Z&S knowing that Z&S would then give the money to ZM in connection with the packing facility.  By July 2008, Aron was concerned that Zaninovich and Z&S were not solvent.  On July 1, 2008, the Land Bank sent Aron a letter regarding the ZM loan which stated that while the loan was delinquent, it may be suitable for restructuring.  On August 4, 2008, the Margosians and Zaninovich signed an application to restructure the Land Bank loan.

According to Zaninovich, he and Aron talked almost daily and they had many conversations about Z&S's financial condition.  Zaninovich would tell Aron where they were at, if they were stretched, and what they were doing.  Around September 2008, Zaninovich told Aron that Z&S was hurting now and they needed "to get the money in here or else we're not going to be able to continue operating, and everything is going to

blow up." The two were looking for additional investors to "get over the hump." Aron was willing to help Zaninovich "no matter what" and he would "go to [his] mother's jewelry box" if necessary.

*The September 2008 Guaranties*

On September 16, 2008, Two Play, Two Play Arizona, and Z&S borrowed money from the Bank. The Bank issued the following loans: (1) an $850,000 term loan to Two Play Arizona to refinance an existing loan with the Bank under the name Two Play Farms; (2) a $400,000 crop line of credit and $1.4 million term loan to Two Play to refinance an existing loan with the Bank under the name Two Play Farms and to provide additional funds to refinance loans with other parties; and (3) a $4.3 million loan to Z&S, comprised of a $1.3 million term to refinance the existing Z&S loan, and a $3 million line of credit to assist with Z&S's working capital needs.

In connection with the loans, the Margosians signed five "Continuing Guaranty" agreements. On two of the guaranties, which were for Two Play's and Two Play Arizona's indebtedness to the Bank, the Margosians signed as guarantors in their individual capacities (the 2008 Personal Guaranties). Two of the guaranties were for Z&S's indebtedness to the Bank: (1) Two Play was the guarantor on one guaranty, which Aron and Zaninovich signed as managers of Two Play; and (2) Two Play Arizona was the guarantor on the other guaranty, which the Margosians and Zaninovich signed as members of Two Play Arizona. The remaining guaranty was for Two Play Arizona's indebtedness to the Bank with Two Play as the guarantor; Aron and Zaninovich signed as Two Play's managers.

Each guaranty contained provisions by which the guarantors waived any requirement that the Bank disclose information about the debtor and disclaimed any reliance upon any statement or representation made by the Bank concerning the debtor's financial condition or relationship with the Bank. Because the 2008 Personal Guaranties made the Margosians guarantors of Two Play's indebtedness to the Bank, and Two Play

8.

in turn was the guarantor of Z&S's indebtedness to the Bank, the Margosians were subject to potential personal liability for Z&S's debts if Z&S defaulted and Two Play could not pay Z&S's debt.

Bushell met with the Margosians in connection with the execution of the 2008 Personal Guaranties. Covey, Z&S's controller and financial consultant, also attended the meeting. Before signing the guaranties, Aron asked Bushell about Z&S's financial strength.[2] Bushell responded that she could not share that information with the Margosians and they needed to speak with Zaninovich. After that, Aron and Covey went into the hallway and had a private conversation. Aron told Covey he was concerned about putting his share of the Exeter property up for collateral; Covey told him the guaranties would cover his share of the property and there was enough equity in the property so that his share should not be affected. Covey also advised Aron to speak with Aron's attorney, Fitzgerald. The Margosians signed the 2008 Personal Guaranties without speaking with their attorney.

*Z&S Defaults on its Obligations*

When the September 2008 loans were taken out, the Bank, in an agreement with Z&S, changed Z&S's financial reporting requirements – it increased Z&S's reporting of its financial information from quarterly to monthly, and switched it from a non-formulaic to a formulaic borrowing structure. The Bank did this because it wanted to make sure that the operating line that was committed to Z&S did not make its way to other related entities as it had in the past; by putting Z&S on a formula, the Bank could manage the line more frequently and ensure the monies were not "being downstreamed" to other entities.

---

[2] Bushell testified at trial that she was asked something to the effect "Can Marty or Z&S cover these loans?" or "Is Z&S healthy enough to pay these debts?" which she interpreted as a question about Z&S's financial strength. Aron testified at trial that he asked Bushell: "Is Z&S able to do all this?"

At the end of December 2008, the Bank placed a temporary hold on Z&S's line of credit, as Z&S's October and November reports reflected a negative borrowing margin. The Bank was concerned that funds were being re-loaned to other entities, so it wanted to review future advances as they were requested to ensure they were for operating expenses. Thereafter, all advances Z&S requested were approved; the last advance was received at the end of April 2009.

Around April 2009, Zaninovich asked the Bank for a $1 million increase in his commitment because he may have "a flood of PACA liens."[3] Zaninovich was supposed to be holding money in grower accounts in trust for local farmers; the Bank was concerned that Zaninovich did not have sufficient funds to pay grower payables. If he did not have the grower account money and could not satisfy the payables, growers could file a "PACA lien" against the company to protect themselves until they received payment.

When Z&S fell behind on paying its growers, the growers filed suit in federal court under PACA statutes, effectively putting Z&S out of business.[4] Z&S shut down its operations in late June 2009 after PACA creditors filed a temporary restraining order freezing about $1.4 million in cash in the company's accounts at the Bank, as well as at another bank. The PACA claims, which totaled about $5.4 million, had priority over the Bank's liens on accounts receivable and inventory.

The Bank transferred the management of the Z&S, Two Play and Two Play Arizona loans to its special assets department. The loans went into default; the Bank notified the Margosians of Two Play's default and demanded payment.

---

[3] PACA is an acronym for the Perishable Agricultural Commodities Act, 7 U.S.C. § 499e(c).

[4] The suit was part of multiple claims and cross-actions filed in the Eastern District of California, *Onions Etc., Inc., et. al. v. Z&S Fresh, Inc., et. al.* Case No. 1:09-CV-00906-AWI-MJS.

*The Intercreditor Agreement*

The Bank worked with Aron following the default on Two Play's loans. In August 2009, the Bank entered into an Intercreditor Agreement, dated June 18, 2009, with Two Play and a third party distributor, David E. White Company, Inc. (also known as Trinity). Trinity agreed to advance $348,280 to Two Play to fund Two Play's upcoming crop harvest, which was to be repaid from the revenue generated by crop sales.

In the Intercreditor Agreement, Two Play affirmed that (1) the Bank's loans were secured by Two Play's property, and (2) Two Play was in default and owed the Bank $370,604.16 under the crop line of credit and $1.33 million under the term loan. The Intercreditor Agreement contained an "Acknowledgement of Guarantors[,]" by which the Margosians acknowledged and agreed that their guaranties of Two Play's obligations to the Bank continued in full force and effect with respect to Two Play's obligations under the credit agreement concerning the 2008 loan to Two Play, and they reaffirmed each representation, warranty and waiver set forth in their guaranties. The Margosians further acknowledged that their guaranty applied to all of Two Play's indebtedness under the 2008 credit agreement. Aron's attorney reviewed the Intercreditor Agreement before Aron signed it.

*This Lawsuit*

The Margosians initiated this action on June 30, 2010, when they filed their complaint against the Bank and its employees Curt Covington and Bushell, as well as the Margosians' accountants, bookkeepers, attorneys and management consultants. It alleged, among other things, that the defendants had suppressed facts about Zaninovich's financial dealings, management and stability, and failed to disclose that Zaninovich was draining money from accounts and obtaining loans with falsified financial documents, in order to induce the Margosians into putting additional money into the businesses and signing additional loans.

11.

On September 15, 2010, Two Play sold the Exeter property to Aron's friend Derderian for $1.325 million. The sale proceeds were used to pay down Two Play's debt to the Bank, with a shortfall still remaining. The Bank did not foreclose on the Exeter property. Sometime thereafter, Zaninovich conveyed his interest in Two Play to Aron as part of a settlement agreement, making him the sole owner of Two Play.

After filing second and third amended complaints in July and November 2011, the Margosians filed a fourth amended complaint (4AC) in March 2012, which asserted 21 causes of action against 11 defendants. The Margosians alleged both fraud and contract causes of action against the Bank, Covington and Bushell. In March 2013, the Bank filed a motion for judgment on the pleadings on the 4AC, which the trial court granted in part and denied in part. As relevant here, the trial court found that the Margosians did not have standing to bring claims on behalf of Two Play, and therefore granted the motion as to the Margosians' claims that were related to the guaranties that Two Play executed. The trial court gave the Margosians leave to amend.

In June 2013, the Margosians and Two Play filed a fifth amended complaint (5AC), which added Two Play as a plaintiff and named only the Bank, Bushell and Covington as defendants. The Margosians asserted claims for rescission based on fraudulent inducement, fraud based on failure to disclose, breach of contract, and tortious breach of contract. Two Play asserted separate claims for rescission and damages, fraud based on failure to disclose, and tortious breach of contract. Two Play and the Margosians together asserted a claim for "aiding and abetting breach of fiduciary duty."

The Bank demurred to the entire 5AC, arguing in part that Two Play's claims were barred by the statute of limitations and did not relate back to the claims the Margosians previously asserted. The trial court agreed with the Bank and sustained the demurrer as to Two Play's claims without leave to amend. The trial court also sustained the demurrer as to the Margosians' causes of action, but gave them leave to amend their fraud claims.

12.

Two Play appealed.  While the appeal was pending, the trial court entered dismissals based on its ruling on the demurrer.

*The Bank's Cross-Complaint*

On July 10, 2013, the Bank filed a cross-complaint against the Margosians for breach of the 2008 Personal Guaranties.  The Bank sought to recover monetary damages, attorney fees, costs and interest.  Specifically, the Bank sought to recover from the Margosians $386,228.28 that was due on the $400,000 crop line of credit and $1.5 term loan that Two Play took out on September 16, 2008, based on the Margosians' personal guaranties.

*The Motion for Summary Adjudication on the Sixth Amended Complaint*

On September 30, 2013, the Margosians filed the Sixth Amended Complaint against the Bank and Bushell.  The Margosians asserted two causes of action: (1) rescission and damages based on fraudulent inducement against the Bank; and (2) fraud and deceit against the Bank and Bushell.  As pertinent here, the Margosians sought to rescind the 2008 Personal Guaranties of Two Play's and Two Play Arizona's debt based on fraud because they signed the guaranties without knowledge of the true facts in reliance on the Bank's fraudulent misrepresentations, and because the Bank failed to affirmatively disclose facts known to the Bank that unreasonably affected the risk the Margosians assumed. The Margosians alleged that the Bank made fraudulent misrepresentations to them on August 24, 2006, when the 2006 Two Play and Z&S loans were issued, at the May 2008 meeting between themselves and the Bank, and when they signed the 2008 Personal Guaranties on September 16, 2008.

The Margosians thereafter filed a motion for summary adjudication (MSA) seeking a ruling that the Bank owed them a duty of disclosure under *Sumitomo*, *supra*, 70 Cal.2d 81.  The Margosians argued that the following facts were sufficient to establish that the Bank had a duty to disclose: when Bushell presented them with the guaranties at the September 16, 2008 meeting, Aron expressly inquired into Z&S's financial

13.

condition.[5]  The Margosians contended that under *Sumitomo*, when a proposed guarantor asks the creditor about any fact materially affecting the proposed risk, the creditor acquires a duty to disclose all material facts within its knowledge.  On this basis, they argued that the only facts needed to establish a duty of disclosure are that the proposed guarantor asked the lender about the risks involved in insuring the debt, and therefore Aron's inquiry was sufficient to create a duty for the Bank to fully disclose material information concerning Z&S's financial condition as a matter of law.  The Margosians asserted that whether the Bank complied with its duty was irrelevant to the motion.

In opposing the motion, the Bank contended that under *Sumitomo*, a lender only owes a duty of disclosure if (1) the requested financial information relates to a material fact affecting the proposed risk; and (2) the guarantor does not know the financial information.  The Bank argued that it did not owe a *Sumitomo* duty to the Margosians because they were well aware of the facts affecting their proposed risk.  The Bank further argued that despite conceding that the Bank was obligated to disclose only facts that materially affected the proposed risk, the Margosians presented no evidence as to which facts would have materially affected their decision.  Finally, the Bank argued the *Sumitomo* claim failed because the Margosians did not inquire about a material fact, did not ask questions pertaining to their personal guaranties, and did not ask about the debtor, namely Two Play.  The Bank presented 60 additional material facts regarding the relationship between the Margosians and Zaninovich, and their respective business entities.

---

[5] In his declaration offered in support of the MSA, Aron declared that he "asked Ms. Bushell for information concerning the risks involved in signing the guaranties." Bushell confirmed at her deposition that the Margosians asked about Z&S's financial capability to pay the loans, and she told them she could not comment on Z&S's financial position.

14.

The trial court denied the motion. The trial court disagreed with the Margosians' claim that the Bank owed them a duty as a matter of law simply because they asked about Z&S's financial condition, since it remained unresolved whether the Margosians asked about material facts affecting their proposed risk. The trial court found that whether the Margosians " 'inquired about facts materially affecting the proposed risk' " was reasonably in dispute in light of the circumstances surrounding the execution of the guaranties[,] as the Bank submitted evidence showing the Margosians were well aware that Z&S was in bad financial shape; they had previously engaged in numerous transactions in order to assist Z&S financially; they were willing to financially help Z&S no matter what; and they believed the loan was for the benefit of their own company. The trial court also found that: (1) what the Bank knew about these circumstances, including Z&S's financial condition, and what it believed might influence the Margosians was unresolved; and (2) the actual question put to the Bank on this issue was not clear and gave rise to a reasonable inference that Aron was asking for financial advice instead of facts materially affecting the Margosians' risk. Accordingly, the trial court concluded that whether the Bank owed the Margosians a duty to disclose was reasonably in dispute, and the Bank met its burden of showing that the issue of duty could not be resolved as a matter of law.

*Trial on the Margosians' Sixth Amended Complaint*

Trial on the Margosians' claims was bifurcated into two phases. First, a bench trial was held from April 15 to 29, 2014, on the Margosians' rescission claim. Following the close of evidence and consideration of the arguments of counsel, the trial court issued a statement of decision orally from the bench, which was later reduced to writing, in which it ruled against the Margosians and in favor of the Bank.

The trial court began by addressing the Margosians' claim that the Bank made fraudulent misrepresentations to them on August 24, 2006 that the deed of trust did not cover their share of the Exeter property. The weight of the evidence showed the

15.

Margosians knew the deed of trust secured Z&S's debt with all of the Exeter property, including their share and the Bank did not make representations to the contrary. The Margosians were willing to place their share of the Exeter property at risk by knowingly executing the deed of trust that secured the $1.3 million loan to Two Play Farms, which included their share of the Exeter property. Moreover, Aron testified that he was willing to guarantee debts made to his own businesses, which was borne out by the Margosians' personal guarantee of the $2.5 million December 2006 ZM loan, and execution of the Intercreditor Agreement in June 2009. The trial court found that this reflected both the Margosians' willingness to risk their share of the Exeter property in August 2006 and the level of risk they were willing to assume when they signed the 2008 Personal Guaranties.

The trial court further found, as to the 2006 transactions, that while Z&S was not owned by the Margosians in name, they were using Z&S to fund and finance ZM, as shown by the numerous loans the Margosians made to Z&S, Zaninovich's testimony that the money for ZM was coming from Z&S, and Aron's acknowledgement in his deposition testimony that money for the packing facility went through Z&S. It was also apparent to the trial court that the $5.5 million loan to Z&S and the $1.3 million loan to Two Play were being obtained, at least in part, to develop the ZM packing facility project.

As to the May 20, 2008 meeting, the trial court rejected the Margosians' claim that the Bank did not disclose financial information about Z&S and the risk associated with entering into the subsequent 2008 transactions, as Z&S's financial problems were discussed and disclosed to Aron at that meeting. In addition, Z&S's distressed financial condition as of May 2008 was apparent to Aron based on the numerous loans the Margosians had given to Z&S that were not being repaid.

Regarding the September 18, 2008 transactions, the trial court rejected the Margosians' contentions that when they signed the guaranties: (1) Z&S was in a distressed financial condition; (2) they were unaware of Z&S's financial condition;

16.

(3) the Bank made fraudulent misrepresentations concerning Z&S's financial condition; (4) they relied on the Bank's misrepresentations; and (5) the Bank failed to affirmatively tell them about the risk associated with the Z&S loan, which was known to the Bank but unknown to them.

As to Z&S's financial condition in September 2008, the trial court found, based on the testimony of Bank employees, that the mere fact that the Bank's problem credit memos showed Z&S had negative working capital ranging from $1.2 to $2.5 million between 2006 and 2008 did not necessarily mean the company was not healthy.[6] The trial court disagreed with the Margosians' claims that the Bank knew Z&S was in a distressed financial condition because it waived Z&S's loan covenants, Z&S submitted late reports, Z&S's loan was placed on a watch list, and the loan was restructured to formula based, since: (1) late reporting was not uncommon, as up to 70 percent of its borrowers submitted late reports; (2) Z&S was taken off the watch list by September 2008; and (3) it was reasonable to assume that restructuring the loan reduced the risk to the borrower and surety, since the borrower's assets would now more fully support the draws taken on the loan.

The trial court was not persuaded by the Margosians' argument that restructuring the loan increased the risk because Z&S had been relying on an unrestricted cash flow in order to run its business. Instead, the evidence showed that Z&S's financial problems arose largely from shifting money to related entities, and not from its operating costs or ordinary course of business, which was discussed at the May 2008 meeting. Although Z&S had a credit risk score of six, that was considered acceptable in the industry and was shared by many other of the Bank's borrowers. In addition, the Bank's August 2008 problem credit review memorandum stated that despite a net loss, Z&S's net worth

---

[6] The trial court noted that the Margosians placed their one-half of the Exeter property at risk when they executed a trust deed securing Z&S's loan even though Z&S had negative working capital of $1.2 million at that time.

increased due to a $460,000 capital payment by its owner, and negative working capital had improved by $222,000 due to profits, pay down of notes receivable, depreciation of fixed assets, and increase in notes receivable.

The trial court determined there was insufficient evidence to show that the Bank intended to deceive the Margosians or conceal facts to induce them to enter into the guaranties based on a false impression of the risk. The trial court found persuasive Bushell's testimony that the Bank would not have refinanced and given new money to Z&S if it believed Z&S was in critical financial trouble. Moreover, there was no evidence the Bank entered into the 2008 transactions in order to fraudulently exit or terminate the 2006 loans. Three Bank employees all testified the Bank attempted to avoid loan failure by working with borrowers. And, even after the December 2008 restriction precluding Z&S from taking advances without permission, the Bank continued to allow Z&S to make significant draws.[7]

The trial court also determined that the Margosians were well aware of Z&S's financial health based on the following: (1) Aron was told in May 2008 that there was a " 'looming problem' " with Z&S's payment of the 2006 loan; (2) Aron and Zaninovich had a long-time working relationship, the two were actively securing funding for the ZM packing facility and largely using money from Z&S to develop the facility; (3) according to Zaninovich, Aron was well aware of Z&S's financial condition as the two talked daily, and Zaninovich specifically told Aron in September 2008 that Z&S was hurting, needed more money, and everything would "blow up" without it; (4) Aron admitted that as of early 2008, he had concerns about Z&S's financial solvency and he signed Z&S's March

---

[7] In 2008, the Bank was the second largest lender of agricultural loans in the United States and did not have a policy of terminating or decreasing investments in agricultural loans. The Bank's annual reports did not give any indication that the Bank planned to stop agricultural lending or had a strategy to terminate existing agricultural loans.

18.

2008 balance sheet that showed Z&S had $2.6 in debt and $6.5 million in liabilities; and (5) the Margosians had given significant amounts of money to Zaninovich and Z&S through loans and leaving money in their grower accounts, which they provided, at least in part, to fund ZM's packing facility.

There was no credible evidence that the Bank made false representations concerning Z&S's financial condition during the September 2008 transactions. The trial court found persuasive Bushell's testimony that she did not make any statements concerning Z&S's finances at the September 2008 meeting. As to what was said about Z&S at the meeting, the evidence showed that Aron did ask about Z&S's financial strength; Bushell said she could not share that information; and Aron and Covey went into the hallway and had a private conversation. The trial court accepted Covey's testimony as to what was said during that conversation: (1) Aron told him he was concerned about putting his share of the Exeter property up for collateral; (2) Covey told Aron the guarantees would cover his share of the property and there was enough equity in the property so Aron's share should not be affected; and (3) Covey told Aron he should talk to Aron's attorney, Fitzgerald. The trial court rejected Aron's testimony that he was ignorant of his ability to talk independently to a lawyer as he had consulted his own attorney concerning financial matters on other occasions.[8]

As to the Bank's duty to disclose under *Sumitomo*, the trial court found that the Bank "did not fail to disclose any facts unknown to the Margosians that materially increased their risk beyond that which the Bank believed the Margosians intended to assume, or that the Bank reasonably believed might influence their conduct." The

---

[8] The trial court found the evidence did not support the Margosians' contention that the Bank fraudulently concealed the purpose of the September 2008 meeting or that they were told the meeting's purpose was to simply change Two Play's loans to reflect the LLC status or separate Two Play from Two Play Arizona. The trial court further found the Margosians' assertion that they were unaware that $1 million of the Two Play loan was to be paid to Z&S to pay down Two Play's debt was not credible.

Margosians were well aware of Z&S's overall financial health. While they may not have been specifically aware of Z&S's working capital before September 2008, Zaninovich told them about Z&S's financial condition; moreover, they certainly were aware Zaninovich and Z&S were not repaying the Margosians' loans, and Z&S were the same in September 2008 and when Aron signed Z&S's March 2008 balance sheet. Accordingly, in light of what the Margosians knew, the Bank's failure to disclose Z&S's specific monthly working capital, the Bank's covenant waivers, Z&S's late reports, and the restructuring of Z&S's loan did not induce or permit the Margosians to obligate themselves in reliance on a false impression of the risk involved.

Moreover, the guaranties contained waivers of the requirement that the Bank disclose information about the debtor and statements of non-reliance: (1) paragraph 4F stated – "The guarantor assumes the responsibility for being informed of the financial condition, credit, and character of the debtor and of all circumstances bearing upon the risk of nonpayment of any indebtedness, which diligent inquiry would reveal"; and (2) paragraph 13 stated – "In executing the guarantee, the guarantor is not relying on any statement or representation made by the bank concerning the financial condition of the debtor or other matters relating to the relationship between the bank and debtor."

The trial court rejected the Margosians' contentions that the Bank pressured them into signing the documents without reading them and they believed they could not take the documents to their counsel for further review, in light of the other witnesses' testimony regarding what transpired at the meeting.

In summary, the trial court explained the weight of the evidence established that the Bank did not breach its *Sumitomo* duty, and "the Bank's failure to answer [the] Margosians' question about Z&S's financial strength did not induce or permit them to enter into the guaranties in reliance on a false impression of the nature of the risk."

Finally, as to the issue of waiver under *Oakland Raiders v. Oakland Alameda County Colosseum* (2006) 144 Cal.App.4th 1175 based on the 2009 Intercreditor

20.

Agreement, the trial court found that while the evidence supported the Margosians' ratification of the 2008 guaranties and waiver of their right to claim damages, "of more significance here is the lack of evidence suggesting any fraudulent or negligent misconduct by the Bank."

In its conclusion, the trial court stated that the Margosians failed to prove the Bank fraudulently induced them to enter into the 2008 guaranties or that it violated its *Sumitomo* duty. Therefore, the trial court denied the Margosians' request for rescission of the September 16, 2008 guaranties and determined that resolution of the rescission cause of action entirely disposed of the Margosians' legal claim for fraud and deceit.

*Trial on the Bank's Cross-Complaint and the Resulting Judgment*

On August 20, 2014, the trial court conducted a bench trial on the Bank's cross-claim for breach of the 2008 Personal Guaranties based on the phase one trial proceedings and the parties' written submissions. In its statement of decision, the trial court found the Margosians liable for breach of the 2008 Personal Guaranties by refusing to pay Two Play's outstanding loan balance and interest. The trial court subsequently awarded the Bank its attorney fees under Civil Code section 1717 and its costs. The trial court entered judgment in favor of the Bank and against the Margosians in the sum of $399,021.77 in damages and $1,230,010 in attorney fees.

## DISCUSSION

I. The Margosians' Appeal

The Margosians' sole contention on appeal is that the trial court erred in its application of the rule articulated in *Sumitomo*, both when it denied their MSA and at trial. Citing to *Sumitomo*, *supra*, 70 Cal.2d at p. 88, fn. 6, the Margosians argue that a lender has a duty to disclose all material facts within its knowledge when: "(1) an intended guarantor (2) inquires of the lender (3) about the risks it knows in relation to the ability of the borrower to repay the guaranteed debt." The Margosians assert that because it is undisputed that they asked the Bank a material question about the proposed risk and

21.

the Bank failed to disclose any material facts within its knowledge, the trial court erred in ruling on the MSA that there was a triable issue of fact on the issue of duty and in finding at trial that the Bank did not breach its duty of disclosure.

In *Sumitomo*, our Supreme Court addressed the issue of "whether a creditor owes a duty of disclosure to a surety on a continuing guaranty during the course, as well as at the inception, of the suretyship relationship and, if so, the nature and extent of that duty." (*Sumitomo*, *supra*, 70 Cal.2d at p. 84.) The Court held that a creditor owes a duty of disclosure both at the inception of the loan and prior to every new extension of credit to the principal, since each extension of credit creates a new suretyship contract. (*Id.* at pp. 92-93.)

As to the nature and extent of the duty of disclosure, the Court recognized that in "cases involving guaranties of credit," "[a] creditor, such as a bank, does not . . . owe an absolute duty to the surety to disclose, without request by the surety, all facts within its knowledge which may materially affect the surety's risk." (*Sumitomo*, *supra*, 70 Cal.2d at p. 87.) However, "[c]ircumstances . . . may give the creditor reason to believe that the surety will rely on it, rather than the debtor, to receive information material to his risk." (*Id.* at pp. 89-90.) The Court concluded that in those cases, California follows the law as "accurately synthesize[d]" in section 124, subdivision (1), of the Restatement of Security: " 'Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.' " (*Sumitomo*, *supra*, 70 Cal.2d at p. 90.)[9] As the Court

---

[9] The latest Restatement of Law on Suretyship & Guaranty reads, in pertinent part: "(1) If the secondary obligor's assent to the secondary obligation is induced by a fraudulent or material misrepresentation by the obligee upon which the secondary obligor

22.

explained, this rule "recognizes that whether a creditor owes a duty to volunteer disclosure to a surety depends on the nature of the risk guaranteed and the relationship of the parties involved.  This rule places no undue burden on the creditor because it does not require the creditor 'to investigate for the surety's benefit . . . [or] to take any unusual steps to assure himself that the surety is acquainted with facts which he may assume are known to both of them.' " (*Sumitomo*, *supra*, 70 Cal.2d at p. 91, fn. omitted, citing Rest., Security, § 124, com. *b*.)

In discussing the leading California case on a bank's duty to voluntarily disclose to a surety, *American Nat. Bank v. Donnellan* (1915) 170 Cal. 9, 21-23, which held that a bank "owes a greater duty of disclosure to a surety who has not inquired about the debtor's financial status when it, rather than the debtor requested the surety assume the risk[,]" the Court stated in a footnote: "If the intended surety inquires of the creditor about any fact materially affecting the proposed risk, the creditor acquires a duty to disclose all material facts within its knowledge." (*Sumitomo*, *supra*, 70 Cal.2d at p. 88 & fn. 6.)  In support, the Court cited to a Texas appellate court case, *Goodwin v. Abilene State Bank* (Tex.Civ.App. 1927) 294 S.W. 883 (*Goodwin*); an Iowa Supreme Court case,

---

is justified in relying, the secondary obligation is voidable by the secondary obligor.... (3) Subject to subsection[] (4) . . . if, before the secondary obligation becomes binding, the obligee: (a) knows facts unknown to the secondary obligor that materially increase the risk beyond that which the obligee has reason to believe the secondary obligor intends to assume; and (b) has reason to believe that these facts are unknown to the secondary obligor; and (c) has a reasonable opportunity to communicate them to the secondary obligor; the obligee's nondisclosure of these facts to a secondary obligor constitutes a material misrepresentation.  (4) For purposes of subsection (3), whether the obligee has reason to believe that (i) facts unknown to the secondary obligor materially increase the risk beyond that which the secondary obligor intends to assume and (ii) such facts are unknown to the secondary obligor, shall be determined in light of the obligee's reasonable beliefs as to: (a) the nature of the secondary obligor's relationship to the principal obligor; (b) the nature of the secondary obligor's business; and (c) the secondary obligor's ability to obtain knowledge of such facts independently in the exercise of ordinary care." (Rest.3d Suretyship & Guaranty (1996) § 12.)

23.

*Bank of Monroe v. Anderson Bros. Mining & Ry. Co.* (Iowa 1885) 22 N.W. 929 (*Bank of Monroe*); and to Stearns, The Law of Suretyship (5th ed. 1951) § 7.15, pp. 218-219.[10]

---

[10] In *Goodwin*, the surety on a loan that was to provide operating capital for his son-in-law's business asked the bank president what he thought of the business; the president responded with praise for the business and said the surety could not go wrong by helping his son-in-law, but neglected to tell the surety that most of the amount loaned was going to be used to pay off an existing loan with the bank or that he thought more than the loan amount would be required to operate the business. (*Goodwin*, *supra*, 294 S.W. at pp. 884-885.) In determining that the issue of whether the bank committed fraud in procuring the guarantee should have been submitted to the jury, the Texas court cited the "well-established rule" that while a creditor may not have a duty to give information to a prospective surety when no inquiry is made and it may be presumed that the surety has as much knowledge as the creditor, "where such prospective surety makes inquiry of the creditor concerning the nature of the subject-matter of the suretyship, which might in anywise affect the risk which he is to assume, and such creditor undertakes at all to make reply to the inquiry, he is required to make a full and free disclosure of all material facts known to him and unknown to the surety, which might in any manner affect the risk to be assumed, or influence him in becoming a surety." (*Id.* at p. 887.) Applying these principles, the court concluded that when the surety asked the president for information, "such inquiry itself created a trust relation" between the surety and the bank, which imposed on the bank the duty to inform the surety "of each and every material fact which might affect his liability." (*Ibid.*) The court concluded that the jury should have been permitted to determine whether there was fraud, as in its opinion it became the president's duty, "upon being approached by [the surety] for information concerning the business . . . when said president assumed to furnish information to [the surety] upon the subject," to tell the surety the fact of the principal's pre-existing debt to the bank, his intent to apply a portion of the loan to that debt, and that a much larger operating capital was required to conduct the business. (*Ibid.*)

In *Bank of Monroe*, the Iowa Supreme Court cited a similar rule, namely that if the surety asked the creditor, before entering into the contract, for information touching any matter materially affecting the risk of the undertaking, the creditor was bound, "if he assumes to answer the inquiry at all, to give full information as to every fact within his knowledge; and he can do nothing to deceive or mislead the surety without vitiating the agreement." (*Bank of Monroe*, *supra*, 22 N.W. at p. 933.)

While these two cases appear to adopt a rule that the creditor is not required to answer an inquiry from the surety, the treatise the Supreme Court cites, Stearns, The Law of Suretyship (5th ed. 1951), states at section 7.15, pages 218-219, that when the surety makes an inquiry, "the creditor must answer fully and truthfully. The creditor's failure to disclose everything within his knowledge that is material for the promisor to know will

It is this footnote upon which the Margosians' contention of error rests. The Margosians assert the footnote contains "a bright line rule set down by the Supreme Court" which requires the lender to disclose all material facts known to it if the guarantor asks the lender about the risk. The Margosians assert that instead of applying this rule, the trial court applied the rule that relates to a situation where no inquiry is made, which prescribes three conditions that must be satisfied before the creditor has a duty to disclose: "(a) 'the creditor has reason to believe' that those facts materially increase the risk 'beyond that which the surety intends to assume'; (b) the creditor 'has reason to believe that the facts are unknown to the surety'; and (c) the creditor 'has a reasonable opportunity to communicate' the facts to the surety." (*Sumitomo*, *supra*, 70 Cal.2d at p. 93.)

In response, the Bank argues that the Supreme Court did not create in *Sumitomo* a bright line duty of disclosure, but instead "merely suggested that where the guarantor asks the creditor a question about the debtor, the court focuses on the first prong of the three-factor test (i.e., does the creditor know facts that *materially increase the risk* beyond that which the guarantor intends to assume)." Therefore, even if the guarantor asks the creditor a question, the creditor only has a duty to disclose if it is aware of facts that materially increase the risk beyond what the guarantor intends to assume. The Bank asserts that the trial court here found the Bank did not have a duty to disclose because the Margosians understood the financial risks associated with their personal guaranties, and the Bank did not misrepresent or conceal facts to induce the Margosians into executing the guaranties based on a false impression of the nature of the risk.

We need not decide whether the Margosians claim that the trial court erred in finding that the Bank did not have a duty to disclose under *Sumitomo*, or in denying the

be equivalent to an affirmative misrepresentation and will give the surety the right to avoid his agreement."

25.

MSA on this issue, because, even if such a duty existed and the Bank was obligated to disclose the information it possessed, the Margosians have not shown grounds for reversal. This is because the trial court did not only find against them on the issue of duty, but also on the other elements of their fraud claims, and the Margosians fail to show reversible error as to these other elements. (Cal. Const., art. VI, § 13 [no judgment shall be set aside on the ground of procedural error unless reviewing court concludes error resulted in miscarriage of justice]; Code Civ. Proc., § 475 [reviewing court disregards nonprejudicial error, and appellant has burden of demonstrating prejudice].)

As the Bank points out, the Margosians sought rescission based on a theory of fraudulent inducement; their claim for fraud and deceit was based on similar allegations. To prove their fraud claims, the Margosians were required to prove a misrepresentation in the form of either a false representation, concealment or nondisclosure. (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638; *Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 294 (*Hinesley*).)[11] Although the Margosians sought recovery below based on both false representations and concealment, on appeal they address only their concealment claim. " ' "[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment

_____

[11] Fraud in the inducement, which is a subset of the tort of fraud, " 'occurs when " 'the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable.' " ' " (*Hinesley*, *supra*, 135 Cal.App.4th at pp. 294-295.)

26.

or suppression of the fact, the plaintiff must have sustained damage." ' " (*Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248.)

Here, the trial court found not only that the Bank did not breach its duty of disclosure under *Sumitomo*, but also that (1) the Bank did not intend to deceive the Margosians or conceal facts to induce them to enter into the guaranties, (2) the Margosians were well aware of Z&S's financial health, and (3) in light of what the Margosians knew, the Bank's failure to disclose certain information did not induce or permit the Margosians to obligate themselves in reliance on a false impression of the risk involved. The Margosians, however, do not contend that these findings are erroneous or unsupported by substantial evidence.

While the Margosians completely fail to address any of these elements in their opening brief, after the Bank pointed out this deficiency in its brief, they argue for the first time in their reply brief that their fraud claim is viable under a proper interpretation of the *Sumitomo* decision. Specifically, they contend that (1) because the principles of constructive fraud contained in Civil Code section 1573 apply, fraudulent intent is presumed and need not be proven at trial; and (2) the trial court never addressed the element of reliance "under the interpretation that a guarantor's question creates a *distinct* duty[,]" and there is reason to believe they will be able to show reliance under their interpretation of *Sumitomo* because they testified they would not have entered into the guaranties had the Bank fully disclosed the risks.

We need not address arguments raised for the first time in a reply brief. (See *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 ["[A] litigant may not change his or her position on appeal and assert a new theory. To permit this change in strategy would be unfair to the trial court and the opposing litigant"]; *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument."].)

27.

Moreover, the Margosians' arguments are meritless. Constructive fraud is a unique species of fraud that applies only to a fiduciary or confidential relationship; it makes a fiduciary liable to his or her principal even though his or her conduct is not actually fraudulent. (*Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 562.) The Margosians did not plead constructive fraud in the sixth amended complaint or allege that the Bank was in a fiduciary or confidential relationship with them, and they did not argue the issue below. They cannot do so for the first time in their reply brief on appeal.

With respect to reliance, the Margosians argue that the trial court did not address this element based on their interpretation of *Sumitomo*. They assert that the trial court evaluated reliance based on its conclusion that the Bank only had a duty to disclose those facts the Bank believed the Margosians did not know, rather than on the basis that the Bank was obligated to disclose all facts that materially affected the risk. We fail to see the distinction. The Margosians testified at trial had they known the information the Bank possessed, they would not have entered into the 2008 Personal Guaranties. The trial court, however, found otherwise, as it considered the Bank's failure to disclose to the Margosians information it had concerning Z&S, and found that failure did not induce or permit the Margosians to obligate themselves in reliance on a false impression of the risk involved in light of what the Margosians knew about Z&S's financial health. Essentially the trial court found that the Margosians were aware of the risk involved and would have entered into the guaranties even if they had been apprised of the Bank's information concerning Z&S. The Margosians do not contend that this finding is not supported by substantial evidence.[12]

---

[12] Since the trial court found that the Margosians would have entered into the guaranties even if they had been given the Bank's information, their contention, based on *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977, that reliance may be presumed because the undisclosed facts were material is without merit.

In sum, as the Margosians have failed to show reversible error, their appeal must be resolved against them.

## II. Two Plays' Appeal

In its appeal, Two Play contends that the trial court erred by dismissing it from the action when it sustained the Bank's demurrer to the 5AC without leave to amend. They argue that the trial court erred in finding that Two Play's claims were barred by the statute of limitations and did not relate back to the filing of the Margosians' prior complaints.

### A. Trial Proceedings

The 4AC alleged six causes of action against the Bank, Covington and Bushell: (1) fraud claims for negligent and intentional misrepresentation, fraudulent concealment, and cancellation of written instrument; and (2) contract claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

In connection with the fraud claims, the Margosians alleged the Bank fraudulently induced them into executing the loan guaranties by misrepresenting and concealing financial information related to Z&S, and, had they known about Z&S's financial condition, they would not have guaranteed any of Z&S's loans, loaned Z&S money themselves, or deposit any farming proceeds into a grower account with Z&S. Included in the allegations of fraud were the following allegations: (1) Two Play owned the Exeter property; (2) Two Play guaranteed a loan to Z&S; and (3) the Margosians were damaged when the Bank enforced the guaranty signed by Two Play, as the Bank sold Two Play's property to satisfy Z&S's debt, thereby depriving the Margosians of the Two Play property and rendering Two Play, as well as the Margosians' interest in Two Play, worthless.

The Bank filed a motion for judgment on the pleadings on the 4AC. As pertinent here, the Bank argued the Margosians could not state a claim based on the alleged diminished value of their ownership stake in Two Play or the wrongful loss of Two

29.

Play's property because such a claim belonged to Two Play as an LLC, not its individual members, and only Two Play was entitled to sue for its alleged loss of property. In opposing the motion, the Margosians pointed out that the Bank had never challenged the sufficiency of the pleadings before and throughout the course of the litigation both sides had treated the Margosians as the proper parties, and argued they should be permitted to proceed as the proper parties in interest or, in the alternative, they should be given leave to amend to name Two Play as a plaintiff.

The trial court granted the motion based on standing as to the Margosians' claims related to the guaranties executed by nonparty Two Play and to fraudulent inducement concerning Two Play. The trial court weighed whether leave to amend should be granted; it was gravely concerned that the litigation had been pending for over two years and trial was scheduled for the following month, but noted it would be an abuse of discretion to deny leave to amend if the pleading shows on its face it is capable of amendment and no previous demurrer had been filed. Ultimately, the trial court granted leave to amend and vacated the trial date.

The 5AC added Two Play as a plaintiff and named only the Bank, Bushell and Covington as defendants. The Margosians asserted three claims against the Bank – the first cause of action for rescission of their 2008 Personal Guaranties of Two Play's and Two Play Arizona's debt based on fraudulent inducement, and the third and fourth causes of action for breach of contract and tortious breach of contract, respectively. The Margosians asserted the second cause of action for fraud based on failure to disclose against all defendants. Two Play asserted two causes of action against the Bank – the fifth cause of action for rescission of Two Play's guaranties of Two Play Arizona's and Z&S's debts, and the seventh cause of action for tortious breach of contract – and one claim, the sixth cause of action, against all defendants for fraud based on failure to disclose. The Margosians and Two Play together asserted one claim, the eighth cause of action for "aiding and abetting breach of fiduciary duty[,]" against all defendants.

30.

The Bank filed a demurrer to the 5AC on the ground that all of the causes of action failed to state facts sufficient to constitute a cause of action. The Bank argued that Two Play's fraud claims were barred by the applicable three-year statute of limitations and Two Play's contract claim was barred by the applicable four-year statute of limitations. The Bank further argued that the relation-back doctrine did not apply because: (1) Two Play was a new party; (2) Two Play was seeking to enforce an independent right, namely to recover $11 million in connection with the loss of Two Play's property, damages associated with farm losses and losses in its grower account, and to rescind its guaranties of Z&S's debt; (3) the Bank could not be held liable for failing to disclose Zaninovich's and Z&S's financial condition to Zaninovich, who was a co-owner and co-manager of Two Play; and (4) Two Play was seeking to impose greater liability on the Bank, as it was seeking to recover not just Aron's one-half interest in the Exeter property, but the full value of that property as of 2006.

The Bank also argued that the sixth, seventh and eighth causes of action against Two Play failed for other reasons. The sixth cause of action for fraud failed to state a claim because (1) the 5AC failed to explain how Two Play, an entity Zaninovich half owned, could be unaware of facts regarding Zaninovich or Z&S, or known to them, which Zaninovich solely owned; and (2) Two Play could not sue the Bank because it regretted its decision to sell the Exeter property. The seventh cause of action for tortious breach of contract failed to state a claim because Two Play was not a third-party beneficiary and there was no enforceable underlying agreement. Finally, the eighth cause of action for aiding and abetting fraud failed to state a claim because (1) it failed to plead facts, with particularity and specificity, showing the elements of fraud; and (2) it failed to allege that the Bank "substantially assisted" in the commission of Zaninovich's alleged fraud.

In opposition, Two Play argued that it was a proper party in part because (1) the Bank was not surprised or prejudiced by allegations concerning Two Play's interests as

31.

the parties recognized Two Play's interests were at issue since the inception of the action, the Bank was aware that the Margosians sought to protect Two Play's rights, and the Margosians' allegations consistently treated Two Play's interests as ones they could protect; (2) at all relevant times, the Bank dealt with the Margosians and Two Play collectively; and (3) the Margosians' prior claims and Two Play's claims in the 5AC were based on the same general facts and involved the same injuries, which resulted in damages of the same character and which were incurred in the same manner.

As to the Bank's other arguments, the Margosians and Two Play contended that (1) the fraud claims were properly pled, as they alleged that the Bank failed to disclose facts in violation of their duty imposed under *Sumitomo*, as to all plaintiffs, and it is possible for *Sumitomo* to apply to Two Play because Zaninovich's knowledge should not be imputed to Two Play since he was acting adversely to Two Play's interests; (2) the eighth cause of action was valid because it arose from the same basic facts, the fraud was pled with specificity, and the 5AC alleged the Bank substantially assisted Zaninovich; and (3) Two Play was a third-party beneficiary of the alleged contract.

The trial court sustained the demurrer as to the first two fraud causes of action alleged against the Margosians with leave to amend, and sustained the demurrer as to the remaining causes of action without leave to amend. The trial court found that Two Play's fifth, sixth and eighth causes of action were time barred. The trial court also found that the relation-back doctrine did not apply because (1) the Margosians' and Two Play's claims did not rest on the same general set of facts, as the Bank's duty of disclosure to Two Play differed from its duty to the Margosians; (2) the parties' alleged injuries were not the same since the Margosians did not own the Exeter property; and (3) the parties' guaranties were separate instruments. With respect to Two Play's breach of contract claim, the trial court found that Two Play was not a third-party beneficiary of the contract. Finally, with respect to the aiding and abetting claim, the trial court found that the 5AC wholly failed to assert facts with the required particularity to support the

Margosians' and Two Play's claims that the Bank aided and abetted Zaninovich in wrongfully taking funds. The trial court stated that it was not addressing the parties' other contentions.

B. Analysis

In reviewing an order sustaining a demurrer "[w]e independently evaluate the complaint, construing it liberally, giving it a reasonable interpretation, reading it as a whole, and viewing its parts in context. [Citation.] Treating as true all material facts properly pleaded, we determine de novo whether the factual allegations of the complaint are adequate to state a cause of action under any legal theory. . . ." (*Burns v. Neiman Marcus Group, Inc.* (2009) 173 Cal.App.4th 479, 486.)

We review the trial court's result for error, not its legal reasoning. (*Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 631.) The plaintiff bears the burden of overcoming all of the legal grounds on which the trial court sustained the demurrer, i.e. all the grounds raised in the demurrer. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 880.) If a proper ground exists for sustaining the demurrer, we affirm "even if the trial court relied on an improper ground, whether or not the defendants asserted the proper ground in the trial court." (*Id.* at p. 880, fn. 10.) On the other hand, "[i]f the complaint shows entitlement to relief under any possible legal theory, the trial court erred in dismissing the action." (*Castro v. Higaki* (1994) 31 Cal.App.4th 350, 356.)[13]

The trial court found that Two Play's fraud based claims were time barred, as they were subject to the three-year statute of limitations in Code of Civil Procedure section

---

**13** Two Play challenges only the trial court's ruling that its claims are barred by the statute of limitations. The trial court, however, sustained the demurrer as to the seventh and eighth causes of action on additional grounds that Two Play does not challenge on appeal. Since we must affirm the judgment if it was correct for any of the reasons stated in the demurrer, we address only Two Play's appellate arguments as they relate to the fifth and sixth causes of action for rescission and fraud based on failure to disclose.

33.

338. Two Play does not challenge this finding on appeal. Instead, Two Play contends its fraud claims relate back to the Margosians' earlier complaints, as they arise from the same general facts, involve the same injury and refer to the same instrumentality as the allegations with respect to the Margosians. (See *Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 244 (*Branick*) [relation-back doctrine applies where amended complaint rests on same general set of facts, involves same injury, and refers to same instrumentality as original complaint].)

We disagree. It is well settled that "an amended pleading that adds a new plaintiff will not relate back to the filing of the original complaint if the new party seeks to enforce an independent right or to impose greater liability against the defendants." (*San Diego Gas & Electric Co. v. Superior Court* (2007) 146 Cal.App.4th 1545, 1550; accord, *Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1278; *Bartalo v. Superior Ct.* (1975) 51 Cal.App.3d 526, 534; see *Branick*, *supra*, 39 Cal.4th at p. 243 [plaintiff substituted into complaint may not state facts which give rise to wholly distinct and different legal obligation against defendant].) Here, a new plaintiff was added to the 5AC which asserted new and independent claims that imposed greater liability against the Bank. For the first time, Two Play sought to rescind the guaranties it executed, which were separate instruments than the ones the Margosians signed as individuals, and to recover damages for being fraudulently induced into entering into the agreements. The damages Two Play sought to recover – the entire value of the Exeter property, which was alleged to be more than $11 million in 2006, and money it held in grower accounts at Z&S – were greater than what the Margosians previously could seek, since the Margosians did not own the Exeter property or the money Two Play held in the grower accounts. For these reasons, Two Play's claims cannot relate back to the Margosians' prior complaints.

The cases on which Two Play relies to avoid this result are distinguishable. In *Tenants Assn. of Park Santa Anita v. Southers* (1990) 222 Cal.App.3d 1293, an

unincorporated association filed suit on behalf of its members, tenants of a mobile home park, against the park's owners and managers, who allegedly were unlawfully forcing tenants out of the park so the property could be sold. (*Id.* at p. 1296.) The trial court sustained the defendants' demurrer based on a finding that the association lacked standing to sue. The appellate court concluded that the association had standing to sue in its representative capacity, as there was an ascertainable class with a community of interest in questions of law and fact, but it did not have standing to sue for its members' anxiety, emotional distress, or personal injuries, as those alleged injuries were too intangible and inherently personal to reasonably constitute a community of interest. (*Id.* at p. 1304.) Since the association had standing to sue on some, but not all, causes of action, the appellate court held that leave to amend should be granted to add the individual members as plaintiffs to the already stated causes of action which sought to recover damages for intangible and inherently personal injuries of the individual members. (*Id.* at pp. 1304-1305.) In so holding, the appellate court noted that there would be no prejudice to the defendants, as the association would not be stating new causes of action or new facts. (*Id.* at p. 1305.)

In contrast here, the Margosians did not sue in their representative capacity to recover damages on Two Play's behalf; instead, they sued based on alleged misrepresentations and omissions made to themselves, and then tried to recover for themselves damages that only Two Play could recover. Moreover, the 5AC added new causes of action and new factual allegations, including that Two Play sought to recover damages for misrepresentations and omissions made to it, which allegedly induced it to execute the guaranties, and that Aron was the only person able to protect Two Play's interests.

For this reason, Two Play's reliance on *Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 21-22, *Haley v. Dow Lewis Motors, Inc.* (1999) 72 Cal.App.4th 497, 507-509, *California Air Resources Bd. v. Hart* (1993) 21 Cal.App.4th 289, 300-301, and

*Jensen v. Royal Pools* (1975) 48 Cal.App.3d 717, 721, is also misplaced. Those cases all involved substituting a plaintiff with standing in place of a plaintiff who lacked standing without alleging new causes of action or new facts, or seeking to impose greater liability on the defendant.

The Margosians contend that *Pasadena Hospital Assn., Ltd. v. Superior Court* (1988) 204 Cal.App.3d 1031 (*Pasadena Hospital*) is "on all fours with the question" presented here. In that case, a physician, who had previously formed a professional corporation, sued his former employer, a hospital, in his individual capacity for libel and intentional or negligent interference with prospective economic advantage. The trial court later granted the physician's motion to amend the complaint to state all his claims in his corporate, as well as his individual, capacity, and overruled the hospital's demurrer, which argued that the new plaintiff's claims were barred by the statute of limitations. (*Id.* at pp. 1033-1034.)

The appellate court denied the hospital's writ of mandate, finding that the trial court properly allowed the amendment to relate back to the original complaint. (*Pasadena Hospital*, *supra*, 204 Cal.App.3d at pp. 1033, 1034.) Noting that the policy behind the statute of limitations, i.e. to put defendants on notice of the need to defend against a claim in time to prepare a fair defense, is satisfied when recovery is sought on the same basic set of facts, the court concluded that the resulting harms to the physician and corporation did not appear to be distinct, their claims were identical as they arose from the same conduct by the hospital, and the damages to both the corporation and physician were of like character and incurred in a like manner. (*Id.* at p. 1036.) The court rejected the hospital's argument that adding the physician's corporate status as a plaintiff constituted an entirely new and different party, as the addition "merely remed[ied] a technical defect" to reflect the physician's status at the time the alleged libel occurred. (*Ibid.*) Finally, the court noted that by adding the professional corporation, the substantive basis of the cause of action was not changed, no different underlying

obligation by the hospital was created, and no new facts were alleged as a basis for recovery, and therefore no possible prejudice to the hospital would result. (*Id.* at p. 1037.)

The difference between *Pasadena Hospital* and the instant case is that here, Two Play was added as a plaintiff, not to assert the same claims as the Margosians, but to assert its own independent causes of action. Two Play was not a professional corporation that was synonymous with a sole owner. Instead, at the time of the alleged fraud, it was an LLC owned by both Aron and Zaninovich. In asserting its fraud claims, it was required to allege that it was ignorant of the facts, namely Z&S's financial condition. As the Bank notes, Two Play could not allege that Zaninovich, its half-owner, was unaware of Z&S's financial condition, as he was its sole owner. In an attempt to avoid Zaninovich's knowledge being imputed to it, Two Play alleged that Aron was the only person able to protect Two Play's interests, as he was the only manager and member who did not have a conflict of interest with Z&S, and therefore the Bank was responsible for failing to disclose Z&S's financial condition to Aron. These allegations present new facts that were injected into the lawsuit at the 11th hour, which can hardly be said to give the Bank time to prepare a fair defense on the merits.

In sum, the trial court properly found that Two Play's claims were time-barred.

## DISPOSITION

The order sustaining the demurrer as to Two Play's claims alleged in the fifth amended complaint and the judgment are affirmed. Costs on appeal are awarded to respondents.

_____
GOMES, J.

WE CONCUR:

_____
HILL, P.J.

_____
LEVY, J.